### In re MONTELLO BRICK WORKS.

(District Court, E. D. Pennsylvania.   July 20, 1908.)

#### No. 2,922.

1. LANDLORD AND TENANT—FORFEITURE OF LEASE—WAIVER BY RECEIPT OF RENT.

A lessor, who receives rent after a forfeiture of the lease, thereby waives the forfeiture, and the lease is restored to its original force and effect.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, § 345.]

2. SAME—LEASE CONSTRUED—RIGHT TO REMOVE TRADE FIXTURES.

A lease for a long term of years, which provided that at the expiration of the term, or its earlier termination as therein provided, the lessee should surrender the premises "in good order and condition, with all improvements, additions and extensions without any compensation to be paid for said improvements, additions and extensions," did not vest title to such improvements, etc., in the lessor, when they were made, but only to such as remained when the lease was terminated, and such provision did not affect the right of the lessee to remove trade fixtures during the term or while the lease remained in force.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, §§ 577–584.]

3. FIXTURES—BUILDINGS—"TRADE FIXTURES."

In the absence of an agreement to the contrary, a lessee may remove fixtures which it places on the leased premises for trade purposes while the lease is in force, and such fixtures include not only machinery, but buildings erected for trade purposes.   Under a lease of premises for a long term of years to be used for manufacturing purposes, a building erected for a manufacturing plant is a trade fixture, which the lessee may remove during the term, regardless of its size or the materials of which it is made.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Fixtures, § 62.

For other definitions, see Words and Phrases, vol. 8, p. 7042.]

In Bankruptcy.   On certificate of review.

Harry F. Kantner, for trustee.

Richmond L. Jones and Charles Henry Jones, for landlord.

Arthur G. Dickson, for Fourth St. Nat. Bank of Philadelphia, a creditor.

Wellington M. Bertolet and Duane, Morris, Heckscher & Roberts, for other creditors.

J. B. McPHERSON, District Judge.   The motion to quash the appeal or certificate of review allowed by the referee on May 9, 1908, from his decision entered on March 20th, is refused.   This appeal, however, has in effect been superseded by the subsequent proceedings before the referee.   The forfeiture of the lease, upon which the decision appealed from was rested, was afterwards waived by the lessor, and the status quo was thereupon restored by its voluntary action.   For this reason the technical objections raised by the motion to quash scarcely merit consideration.   Moreover, the question sought to be raised is involved in the certificate granted to review the order entered on May 16th, and one ruling will dispose of both appeals.

The facts upon which the present controversy turns are thus stated in the report of the learned referee (Samuel E. Bertolet, Esq.): .

"On April 21, 1908, Edward D. Trexler, trustee of the bankrupt, filed a petition praying for leave to sell 'buildings, machines, engines, boilers, etc., known as trade fixtures, which were erected upon and attached to the leasehold premises of the bankrupt during the term of the lease entered into between the Montello Brick Company and the Montello Brick Works, dated January 1, 1903.' A full list of said fixtures, improvements, additions, and extensions, excepting the buildings, appears in the inventory and appraisement filed in this case. It was ordered that April 28, 1908, at 10 o'clock a. m., should be fixed for a hearing on the trustee's petition. On April 28th, the trustee and certain creditors appeared before the referee. There also appeared the Montello Brick Co., lessor, and filed objections to the granting of an order of sale to the trustee. The petition and objections were heard at the same time.

"It is my belief that all the facts which have appeared in this case, whether admitted by all the parties or shown by testimony, may be taken into consideration, together with such additional facts which were submitted to the referee at the hearing on the petition. I believe this, because the whole matter is, after all, only one case, and a court of equity has authority to take a general birds-eye view of all the facts brought out in a case. Most of the facts which I am about to find were either admitted or practically uncontradicted. No facts will be found, however, which were not testified to in the presence of the Montello Brick Company, the principal party appearing against the trustee's application, or admitted by it.

"I find the facts to be as follows:

"On January 1, 1903, Montello Brick Company leased to Montello Brick Works, the bankrupt, a number of tracts of land in Berks and Montgomery counties, on some of which were located brick manufacturing plants. Those in Berks county were called Vinemont, Montello, and Wyomissing, and that in Montgomery county was called Perkiomen.

"The lease also demised certain tracts of land on which no buildings whatever were erected. One was a tract of farm land containing about 30 acres.

"The lease also demised the machinery, tools, and other personal property then in and about the various plants named, with the real estate, and an inventory of the machinery, tools, and other personal property was attached to the lease and made part thereof. This inventory shows such property as having been located at Vinemont, Montello, Wyomissing, and Perkiomen plants.

"The lease provided, among other things, that the lessee should keep the demised premises in good order and repair, and should replace all machinery and buildings worn out or destroyed.

"The term was for 990 years.

"The lessee agreed to pay an annual rental of $63,000. The intent was that each stockholder of the lessor company—there being $1,050,000 worth of stock outstanding—should receive a net sum equal to 6 per cent. upon the capital stock, and to that end the rental aforesaid was to be divided, and payment made by the lessee as follows (quoting from page 14 of the lease): 'On the 1st days of January and July of each and every year $15,000 shall be paid to the holders of the preferred capital stock (10,000 shares, at $50 each), being at the rate of 3 per cent. on $500,000, or $1.50 on each share thereof; and, on the 1st days of April and October of each and every year $16,500 shall be paid to the holders of the common capital stock (11,000 shares, at $50 each), being at the rate of 3 per cent. on $550,000, or $1.50 on each share thereof, excepting the first payment on the 1st day of April, A. D. 1903, which, being but three months after the commencement of the lease, only one-half of the semiannual payment provided for the common capital stock will be due and payable. Montello Brick Company shall furnish a list of its stockholders, with the post office address of each of them, to Montello Brick Works 15 days before every quarterly dividend period, and Montello Brick Works shall pay such dividend directly to the stockholders by mailing a check to each of them to the address given on said list.'

163 F.—40

"On page 16 of the lease between the parties, it was provided that: 'In case of the bankruptcy or insolvency of Montello Brick Works resulting in the appointment of a receiver of the demised premises, or in case the control of Montello Brick Works in the demised premises shall be vested by judicial sale in an assignee, then this lease and the term thereof shall, at the option of Montello Brick Company, cease and determine, and Montello Brick Company shall immediately, at this option, be entitled to take possession of the demised premises, and, if Montello Brick Company shall elect to take possession of the premises, the same shall not pass into the possession of such receiver or assignee.'

"On page 17 of said lease, covenant 2 provided that: 'If Montello Brick Works shall make default of the payment of any installment of rent hereby reserved for a period of 30 days after the same becomes due and payable, or in the performance of any of its covenants herein contained, then and in any such case, Montello Brick Company may at its option forthwith declare this lease forfeited and at an end, any law or custom to the contrary notwithstanding, and thereupon all the rights of Montello Brick Works, under this indenture or otherwise howsoever, as well to the hereby demised premises as to all improvements, additions, and extensions made or to be made by Montello Brick Works, shall absolutely cease and determine, and the same, together with all the rights, privileges, and franchises of Montello Brick Works and all the property, real and personal, of Montello Brick Works, in Upper Providence township, Montgomery county, and in Spring township, Berks county, Pa., shall absolutely vest in Montello Brick Company, free and clear of all claims and demands whatsoever, without any further action or acts of transfer or other compensation to be paid therefor, and Montello Brick Company may recover possession of the premises with all the improvements, additions, and extensions, as though the same had been originally constructed by and belonged to it,' etc.

"On page 19 of the said lease, it was provided in covenant 3 that: 'At the expiration of the term hereby created, or earlier termination in the way herein provided, Montello Brick Works shall return and surrender to Montello Brick Company the demised premises in good order and condition, with all improvements, additions, and extensions without any compensation to be paid for said improvements, additions, and extensions by Montello Brick Company.'

"Under this lease the lessee, now bankrupt, took possession of the premises described therein and all the brick manufacturing plants with the machinery and other property mentioned in the inventory attached thereto.

"The lessee in the period between January 1, 1903, and the date of its bankruptcy, at various times, expended large sums of money for construction of buildings and for machinery.

"This money was expended as follows:

"A fire partially destroyed the Perkiomen plant, and $26,726.65 was spent in replacing the same. A fire also destroyed the Wyomissing factory, and $91,187.56 was spent in replacing the same. The sum of $27,477.96 was spent in additions upon the Montello plant, which cannot be separated from the original demised property without completely destroying the same. No improvements were made at the Vinemont plant. The lessee also purchased a Thew automatic steam shovel, costing $3,600, which is put on the Wyomissing premises, and which is still there. This steam shovel was not purchased to replace property leased, but was purchased for use in the brick-making business.

"The bankrupt lessee, some time after January 1, 1903, erected on the 30-acre tract above mentioned, located a short distance from the Perkiomen plant in Montgomery county, which it had leased to the Montello Brick Company, a large factory, built of brick foundations and a superstructure of wood and iron girders and corrugated iron sides, and roof made of the usual roofing materials, and other buildings annexed thereto built on brick or stone foundations with a frame superstructure. Into this factory building were placed brick burning kilns, railroad tracks, and machinery pertaining thereto, and into the buildings adjoining were placed brick-making machinery and a complete power plant consisting of engines, boilers, etc. As a whole, this structure was a brick-manufacturing plant, and was intended and used

by the lessee for the carrying on of the lessee's business, which was the manufacturing of brick and other clay products. The buildings, kilns, and certain machinery belonging thereto were put up at a cost to the lessee of $613,813.79. The brick-making machinery, power plant, consisting of engines, boilers, trackage, etc., and all other machinery appurtenant to the plant proper, were purchased and put in place by the lessee at a cost to it of $156,784.31, a total expenditure of $770,598.10. This plant was called the Oaks plant.

"In connection with the Oaks plant, and to be used therewith, the lessee bought on or about December 31, 1903, a steam shovel, at a cost of $5,300, and on or about December 31, 1904, another steam shovel at a cost of $5,300. Both these steam shovels were purchased by the lessee and used in lessee's business. Both remained on the premises.

"On or about October 31, 1907, creditors of the Montello Brick Works, lessee, filed a petition praying that it be adjudged a bankrupt. A receiver was appointed the same day. On December 10, 1907, the said lessee was adjudged a bankrupt.

"On January 1, 1908, an installment of rent, amounting to $21,000, for the period from October 1, 1907, to January 1st, 1908, fell due. The Montello Brick Company, lessor, did not at any time make demand for this rent, in any way; nor did it furnish lessee a list of lessor's stockholders within ten days of said January 1, 1908, as provided in the lease. On January 4, 1908, the lessor's board of directors passed a resolution directing its president to notify the bankrupt lessee that if default in the payment of the January 1st rent continued for 30 days, the lessor would declare the lease forfeited and proceed to exercise all its rights, etc., under section 2 of said lease. This notice, with a copy of the resolution, the president of the lessor company sent by mail to the bankrupt lessee, and the latter received it on the same day. The lessee did not pay the rent, and on February 29, 1908, the lessor's board of directors passed a resolution exercising the option agreed on in section 2 of the lease, and declared the January 1, 1903, lease forfeited and at an end, and directed the president to forthwith recover possession of the demised premises with improvements, additions, and extensions, as provided by the lease. A copy of this resolution was served on the president of the bankrupt's lessee on February 29, 1908. A trustee of the lessee having been appointed on February 13th, a copy of the resolution was also served on him. The lessor did not enter the demised premises at any time to take possession, nor take steps to recover possession.

"Up to this time the trustee did not assume the January 1, 1903, lease as an asset of the bankrupt's estate, declaring that he would not do so unless directed by the creditors. Pending the appointment of the trustee, an inventory and appraisement of all the machinery, tools, and other personal property of all kinds in possession of the bankrupt, whether demised by the 1903 lease or not, was made by the receiver and filed with the referee. The trustee when appointed assumed this inventory and appraisement as correct and took it for his own. It has been offered in evidence and shows in detail the various items of machinery which go to make up and are located at the various plants operated by the bankrupt. It does not, however, contain an inventory and appraisement of any of the buildings. On February 19, 1908, the trustee presented his petition for leave to sell all the property of the bankrupt. He alleges that all the machinery and other personal property purchased by the bankrupt lessee after January 1, 1903, and used in its business of manufacturing brick, and that all the buildings erected on land demised by the 1903 lease, excepting replacements of property demised by the aforesaid lease, belonged to the lessee and could be removed and sold by the lessee or its trustee, as trade fixtures. This petition was heard on March 6, 1908. The Montello Brick Company, lessor, then appeared and objected to the granting of the order of sale. It alleged that it had legally forfeited the lease between it and the lessee, and, showing the facts relating thereto as hereinbefore found, it claimed that the lease was at an end, and that the lessee had no title to the property sought to be sold. Believing that the forfeiture had been legally effected, the referee decided that the trustee could not sell any of the property demised by the 1903 lease, with the im-

provements, additions, and extensions thereto, and found all such to belong to the lessor. The trustee was permitted to sell property not on the leased premises at the date of the forfeiture, and such personal property on the demised premises which was not a necessary part thereto, or such as could not be included under the term 'improvements,' etc. An order to this effect was entered March 18th, permitting the trustee to sell property therein referred to on April 2d to 8th.

"An examination of the bankrupt was held on March 27, 1908, and at this time the fact first appeared that the lessor had not made demand for the rent, that it had not furnished the lessee with the list of the lessor's stockholders 10 days prior to January 1, 1908, as required by the lease. The fact also then appeared that the trustee had not re-entered upon or taken possession of the premises after the forfeiture had been declared. A motion made on that day on behalf of the trustee, asking for a rehearing of the trustee's petition to sell and for an amendment to the order, so as to include permission to sell trade fixtures, was denied by the referee; he at the time believing that the additional facts found were not sufficient to warrant changing the order of March 18th.

"At the meeting of creditors held April 2, 1908, the creditors moved that the referee call a special meeting to determine whether the trustee should tender payment of the rent due to April 1st by the bankrupt lessee to the Montello Brick Company and assume the lease. This motion was carried by an almost unanimous vote of the creditors present and voting, and April 16th, at 10 o'clock a. m., was fixed for the special meeting. Of this meeting due notice was given to all creditors and parties interested. On April 16th, the special meeting of creditors was held, and the bankrupt, the trustee, sundry creditors, and the Montello Brick Company appeared. The resolution was made and passed by creditors present and voting, directing the trustee to tender to the Montello Brick Company, whose president and counsel were present at the meeting, the rent due to date under the lease between the parties, and also that the trustee assume the lease. The trustee, in pursuance of this resolution, assumed the lease, and tendered $38,000, the amount of rent due, to the president of the Montello Brick Company, lessor, who declined to accept the same before conferring with the directors of his company and receiving their authority. On April 18, 1908, there appeared voluntarily before the referee the trustee and his counsel and the Montello Brick Company, by A. J. Brumbach, president and acting treasurer, with its counsel. The Montello Brick Company, lessor, expressed its willingness to accept the tender of rent made by the trustee on April 16, 1908, the lessor by its president and acting treasurer agreed to accept the certified check in accordance with the tender made on April 16th and the trustee thereupon delivered the check for $38,000, and said A. J. Brumbach, president and acting treasurer, received the same for the Montello Brick Company and signed a voucher therefor. This was done in the presence of, and witnessed by, the referee.

"On April 21st, as stated before, the trustee renewed his application for authority to sell the improvements, additions, extensions, etc., as trade fixtures belonging to the lessee, stating that he had assumed the lease, that the lessor had waived the forfeiture of February 29th, if there had been one, and that he was legally entitled to sell or remove the trade fixtures belonging to the lessee. He, accordingly, filed this petition. The petition was heard on April 28th, when the trustee, creditors, and the Montello Brick Company, lessor, appeared. The lessor filed objections in writing to the petition of the trustee, and the objections were heard with the petition. The additional testimony then introduced has been included in the foregoing findings."

Upon the foregoing facts, the referee decided that the order asked for by the trustee should be made, and gave the following reasons for his decision:

"1. The forfeiture of the lease effected by the Montello Brick Company, lessor, on February 29, 1908, if valid, which is very doubtful in the light of the new facts submitted on March 27th, was waived by the acceptance of rent

which accrued after the forfeiture. The lease is therefore not forfeited, but is in force as from the beginning.

"2. A lessee may remove fixtures which it places on leased premises for the purpose of carrying on its trade and business, during the term of the lease, unless the parties, to wit, the lessor and lessee, agree in their lease to the contrary.

"3. The Montello Brick Company, lessor, and the Montello Brick Works, lessee, did not in their lease of January 1, 1903, agree that the lessee might not remove trade fixtures, and said lease does not prevent the removal of trade fixtures by the lessee.

"4. The trustee in bankruptcy, having assumed the lease which the bankrupt entered into with the Montello Brick Company, has all the rights, as well as the obligations, which the bankrupt had under the lease.

"5. The property purchased by the lessee and installed in or about the Montello, Wyomissing, and Perkiomen plants was replacements and additions, and was not trade fixtures. Therefore it belongs to the lessor, excepting the Thew automatic steam shovel located on the Wyomissing premises, in Spring township, Berks county, which is a trade fixture, if not absolute personal property, and is the property of the lessee or its trustee.

"6. The factory building and the appurtenances thereto, with the kilns, brick manufacturing machinery, and power plant, including engines, boilers, and all other machinery appurtenant to the plant called the Oaks plant, is a trade fixture, and is the property of the Montello Brick Works, lessee, and might have been removed by it during the term, and may therefore be removed and sold by its trustee.

"The two steam shovels purchased on December 31, 1903, and on December 31, 1904, at a cost of $5,300 each, and located on or about the Oaks premises, are trade fixtures, if not absolute personal property, and belong to the lessee, and can be removed during the term of its lease, and therefore can be removed and sold by its trustee.

"Owing to the important results likely to follow from the foregoing conclusions, I consider it proper to give my reasons and authorities for them.

"The first conclusion is based upon the law laid down in Johnson v. Lehigh Traction Co., 130 Fed. 943. This case was decided in 1904 in the United States Circuit Court, Third Circuit. Judge McPherson there agreed with the conclusions of the master in that case, the important facts of which are similar to those in this case, was illegal and invalid, and it was especially held there that, if the lessor receives rent accruing after the forfeiture, the forfeiture, although valid in itself, is therefore waived. The consequence must be that a forfeited lease in which the forfeiture has been waived is restored to its original force and effect.

"In an opinion and order filed March 18, 1908, the referee, with the facts as then before him, and on the authority of Isman v. Hanscom, 217 Pa. 133, 66 Atl. 329, decided that the forfeiture of the lease by the lessor of February 29th was valid and legal, and the results following from that decision were embodied in the order filed. Whether the referee erred then, and subsequently when with additional facts on March 27th he refused to amend the order, does not matter now. It may be that error was committed when a rehearing and amendment was refused on March 27th. Leave was, however, given to renew the motion later, if the facts warranted. The trustee in the present petition has, in effect, renewed his motion, and the question of forfeiture being out of the case, under the facts as now existing, an entirely new situation is presented.

"The second conclusion is so axiomatic in its nature, and has become such an elementary principle of the law of landlord and tenant, that it is unnecessary to cite authorities to sustain it.

"The third conclusion, on account of the results likely to follow it, is the most important as affecting the rights of the lessor and the lessee in this particular case. The Montello Brick Company, lessor, and the objector here, relies upon the authority of Isman v. Hanscom, 217 Pa. 133, 66 Atl. 329, to sustain its objections. I believe, however, that that case is clearly distinguishable from this. The objector depends upon the third section of its lease, found on page 19, for its right to invoke the authority of the case of

Isman v. Hanscom. Let us compare the language of the lease in the Isman Case with the language upon which the objector relies in its lease, and discuss each in turn. In the former the lease provided as follows:

" 'And the said lessees shall not make any alterations, additions or improvements to the hereby demised premises without first having the consent in writing of the lessor, and after such consent having been given all alterations, additions and improvements made by either of the parties hereto upon the premises, except movable furniture put in at the expense of the lessees, shall at the option of the lessor remain upon the premises at the expiration or sooner determination of the lease, and·be surrendered with the premises, without molestation or injury, and become the property of the lessor,' etc.

"With this contract before it, the court held, and very rightly so, that the question of trade or tenant fixtures need not be considered, because the contract between the parties had determined the ownership of all the property in question excepting only movable furniture put in at the expense of the lessees. It held, and the case means, that as soon as any alterations, additions, or improvements were made upon the premises, they were, at the option of the lessor, to remain there at the expiration of the lease and become the property of the lessor. It is difficult to see how the court could have arrived at a different conclusion with this language before it. Its opinion makes no new law, but confirms what the cases for 50 years and more had decided, viz., that where the lessee agrees that improvements which he may make upon leased premises shall remain there and become the property of the lessor, that contract is binding upon him and is the law between the parties. In the Isman Case, the lessee in so many words gave the lessor an option upon the improvements, etc., made upon the premises, and that option was that the lessor might elect at any time during the term of the lease whether or not he desired that the improvements made on the premises by the lessee should remain and be irremovable by the lessee, and he gave the lessor the option to say at any time during the term of the lease whether or not the lessor desired to take property in the improvements, etc. It is striking to notice that the court in its opinion lays particular stress upon the words 'at his option,' in connection with the words 'shall remain upon the premises at the expiration of the lease and become the property of the lessor.' If I give an option upon property or upon the title to property with or without consideration, which option may be exercised at any time during a certain period, it must, of course, follow that I have fixed my own and the other party's rights to such property, and it would be impossible for me to take it away and sell it before the time had expired within which the option given could be exercised. As said before, it is difficult to see how the court could have decided otherwise from what it did in the Isman Case, and the law there stated is a well-recognized principle of the law of landlord and tenant.

"It must further be noticed that the court says the important and controlling question arising out of the construction of the lease between the parties is that the lease determined the ownership of the property, and that the rights of the parties thereto depend entirely upon the proper interpretation of the instrument. We thus see that every case must be decided by the interpretation of its own lease, and that the words in the opinion, 'if the lease had been silent as to the ownership of the various items of property in dispute,' cannot mean that the mere reference in any lease to improvements, additions, and alterations is a breaking silence on that subject, and, with no further words, prevents the lessee from claiming title to any property falling within that description. These words as quoted could only have been intended to apply to the particular lease under inspection, which, undoubtedly, in the terms quoted therefrom, disposed of the right to remove from the leased premises, and the ownership of, the various items of property in dispute. The court means and says no more than that, if the parties did not dispose of the right of removal and the ownership of property in their lease, it becomes necessary to determine whether the property claimed is trade fixtures, and, if so, to whom does it belong.

"Turning to the lease between the Montello Brick Company and the Montello Brick Works, we find the lease reads: 'At the expiration of the term hereby created or earlier termination in the way herein provided, Mon-

tello Brick Works shall return and surrender to Montello Brick Company the demised premises in good order and condition, with all improvements, additions, and extensions, without any compensation to be paid for said improvements, additions, and extensions by Montello Brick Company.'   A comparison of this language with that used in the lease construed in the Isman Case shows a vast difference.   There the lessor obtained an option upon the improvements then made, to say what should become of them.   The parties agreed that the improvements should remain upon the premises at the expiration of the lease, if the lessor should request it, and the lessor was to have any time during the term within which to exercise his option or right to request, whereupon the property became the lessor's.   In this case the lessee agrees to return and surrender to the lessor the demised premises in good order and condition, with all improvements, additions, and extensions, without compensation, at the expiration of the term.   It is first to be noted that the lessee gives no option on property or right of property in improvements, additions, and extensions to the lessor during the term, but a contingency must first arise before they can be claimed by the lessor, viz., the term must expire.   There is no immediate property or right of property granted by the lessee to the lessor.   It must, secondly, be noticed that this clause gives the lessor no more rights than it would have had and no more property in improvements, additions, and extensions than it would have had under the law without the insertion of this covenant.   The cases are uniform in saying that all improvements, additions, and extensions, whether trade fixtures or other fixtures, become the property of the owner of leased premises at the expiration of the term and must be turned over to the lessor with the demised premises.   No words to this effect need be inserted in a lease.   The law gives the lessor the property without any agreement whatever to that effect, and it is not even necessary for the lessor to compensate the lessee therefor.   It might be urged that this third covenant must mean something different, or else it would not have been inserted ; but I will not read into a lease what the parties have not agreed to, and the mere insertion of covenants that are unnecessary and give the lessor no more than we have found they would have without their insertion cannot give the lessor greater rights.

"It must, thirdly, be noticed that the parties do not agree that all improvements, etc., when made, must remain on the premises from that time on without right of removal or property in the lessee, but that the demised premises must be returned to the lessor at the end of the term with improvements, etc., then on them without charge by the lessee for the latter. As just said, this is simply a declaration of law as it is without the insertion of the third covenant.

"I am fortified in the foregoing reasoning by the case of Hey v. Bruner, 61 Pa. 87, decided in 1869.   In that case the lessor leased a factory for 10 years.   The lessees covenanted: 'And at the expiration of the said term shall and will quietly and peaceably yield up and surrender the possession of the said premises demised, together with all and every the improvements and additions which they the said lessees, shall construct and make thereon unto the lessor, in good order and condition, reasonable wear and tear, etc., excepted.'   It was further covenanted: 'Lessees shall forthwith take possession, and shall with all convenient dispatch make alterations, additions and improvements of a permanent character to consist of items agreeably to a specification and plan to be approved by the lessor, and to introduce machinery necessary to the purpose of their business, hosiery manufacturing, permanent additions and improvements to remain on the property at the expiration of this lease and to belong to the owners of the fee to said premises.'   The language first quoted is in essence like that in covenant 3 of the lease before us.   It was held that, although the lessor by this lease, no doubt, intended that the machinery installed should belong to him at the expiration of the lease, yet he did not so provide, and therefore there was no doubt under the lease that lessee had a right to remove the fixtures, consisting of engine, boiler, shafting, hosiery machinery, etc., as trade fixtures from the freehold during the term of the lease.   The court held that a plea of property must be supported by proof of a superior title on the part of the lessor.

"If the first quotation of the lease in Hey v. Bruner had in that case per-

mitted the lessee to remove his trade fixtures, and if it was in that case held that such language had not put out of it the question of trade fixtures, then the language in the lease before us, being almost identical, must mean that the lessee in this case must have title to and the right to remove and sell trade fixtures.

"The fourth conclusion is practically admitted by the objecting lessor here; his brief of argument assuming that a trustee in bankruptcy, who assumed the lease, has the same rights and obligations as his lessee had. There is no question in my mind that this is true.

"The fifth conclusion is a necessary result of findings of fact, the referee having found that the lessee was bound to replace all destroyed or worn out portions of the demised property, and, having found that the property installed by the lessee at or about the Montello, Wyomissing, and Perkiomen plants was necessary replacements or inseparable additions, it must follow that the lessee can have no right to remove anything from said plants excepting, however, the steam shovel located on the Wyomissing premises, which is a trade fixture and belongs to the lessee.

"The sixth conclusion brings up the question: what is included in the term 'trade fixtures'? It having been found that the law of trade fixtures applies to this case, and that the Montello Brick Works, lessee, or its trustee in bankruptcy, may remove and sell them during the term of the lease, that the lease has not expired, and it having been found that the rule applies in this case only to the trade fixtures located at what is known as the Oaks plant, excepting the steam shovel mentioned in the fifth conclusion, some explanation or authority for the sixth conclusion is necessary.

"In Van Ness v. Pacard, 2 Pet. 137, 7 L. Ed. 374, the United States Supreme Court, in deciding a case coming before it from the District of Columbia, Judge Storey, delivering the opinion, said that a lessee may, during the term of his lease, remove from the leased premises any fixtures erected thereon for the purposes of trade, and they included in the term 'fixtures' not only machinery, but buildings as well. The court there said that the question whether fixtures erected for the purposes of trade are, or are not, removable, does not depend on the form or size of the building to be removed, whether it has brick foundations or stone, or is one or two stories high, or has a brick or other chimney. The sole question is whether it is designed for the purposes of trade. The court said that a trade fixture might mean any building, whether wood, stone, or brick, of any size or form, as well as engines, boilers, machinery, or similar fixtures necessary for the lessee's business. This case has been followed in the United States courts in the following cases: Steers v. Daniel (C. C.) 4 Fed. 587; Freeman v. Dawson, 110 U. S. 264, 270, 4 Sup. Ct. 94, 28 L. Ed. 141; Searl v. School District, 133 U. S. 561, 10 Sup. Ct. 374, 33 L. Ed. 740; Brown v. Reno, etc., Co. (C. C.) 55 Fed. 229; Wiggins Ferry Co. v. Railway Co., 142 U. S. 396, 12 Sup. Ct. 188, 35 L. Ed. 1055; Sampson et al. v. Camperdown Cotton Mills (C. C.) 64 Fed. 939; Mercantile Co. v. Railway Co. (C. C.) 109 Fed. 3; Western Union Tel. Co. v. Penna. Co. (C. C.) 125 Fed. 67.

"The same case was also cited in Lemar v. Miles, 4 Watts (Pa.) 330, where a steam engine, boiler, and machinery were set up, walled in with stone and covered with a wooden building, and held by the Supreme Court of this state to be trade fixtures removable under the authority in that case.

"The Van Ness Case was also cited with apparent approval in the case of White v. Arndt, 1 Whart. (Pa.) 91, where it was said that a frame stable, two frame shops, and other improvements erected upon a lot of ground leased by one of the parties under the authority in this case, might have been removed as trade fixtures before the expiration of the lease. It was again cited in the case of White's App., 10 Pa. 252, where the court said that a one-story boiler and engine house built partly of stone and partly of wood, and the engine, boilers, chimney, etc., were personal property and trade fixtures. The remarkable part about White's App. is that the lessor and the lessee agreed that all the steam engines, fixtures, and improvements erected by the lessee on the premises might be removed and taken away at the expiration of the lease or other determination thereof, unless the lessors or assigns elected to retain the same.

"The case of Van Ness v. Pacard was again cited with approval in Hill v. Sewald, 53 Pa. 271, 91 Am. Dec. 209, and in that case White's App. was also cited. and the language of Judge Rogers, saying that the building being attached to the freehold makes no difference, is quoted.

"In Church v. Griffith, 9 Pa. 117, 49 Am. Dec. 548, a building used as a shovel factory, furnaces, chimneys, machinery, and tools were held to belong to the tenant and removable by him during the term of his lease as trade fixtures.

"It will thus be seen that the building, brick kilns, brick-making machinery, engines, boilers, and all the appurtenances to the Oaks plant, having been erected by the lessee for the purpose of its trade and business, must be included in the term 'trade fixtures,' and the trustee must be permitted to remove and dispose of the same. There can, of course, be no question about the two steam shovels referred to in the sixth conclusion falling under the same denomination and going with the rest to the same end.

"The inventory and appraisement filed in this case shows that on December 18, 1907, the Oaks factory, excepting the buildings, was made up of a complete power plant with fire pumps, clay pulverizing machinery, drying machinery, brick molding and pressing machinery, brick cars, kilns, trackage, with all the necessary shafting, tools, etc., for the running of the plant. This inventory and appraisement was made by the receiver of the bankrupt lessee and has been adopted by the trustee. It will save endless detail here to say that all the items checked off in black ink on said inventory under the heading 'Oaks factory inventory,' are trade fixtures made upon the demised premises by the lessee and removable by it or by its trustee, including in said category the buildings within and under which the said machinery, etc., are placed, together with the two steam shovels herein referred to, and we then have a complete schedule of the property which the trustee may sell, and for the sale of which an order is granted."

In view of this full and satisfactory report, further discussion seems to me superfluous.

The order of the referee dated May 16, 1908, is therefore affirmed, and the order of March 20th is modified, so far as may be necessary to harmonize it with this opinion.